7246.   SUTTON *v.* THE STATE.

1. The court properly overruled the motion for a continuance, based on the ground that the father of the accused had been tried for the same offense on the day previous, that both cases involved the same evidence and the same witnesses, and that the jury present in the court during the trial of the father would not be a competent jury on this trial. *Humphries* v. *State*, 100 *Ga.* 260 (28 S. E. 25). See also *Sutton* v. *State*, 18 *Ga. App.* 28 (88 S. E. 744), where the precise point is passed upon.

2. The foregoing facts constituted no sufficient cause for challenge to the array, but, if cause for challenge at all, "the proper method of objecting to such jurors would be by challenges to the polls, if they qualified upon their voir dire." *Humphries* v. *State*, supra. See also *Gordon* v. *State*, 7 *Ga. App.* 691 (67 S. E. 893), and cases there cited.

(a) The record discloses that the court upon its own motion offered to strike from a list of jurors, impaneled to try the defendant in the case under consideration, those jurors who tried the cases against the other defendants involving the same transaction.

3. A ground of the motion for a new trial which assigns error because, on request to correct the solicitor-general for argument objected to as improper, the court ruled that counsel had the right to draw inferences from the evidence, is insufficient, in the absence of an allegation or showing in the ground itself that the argument was not authorized by evidence.

4. The evidence justified the verdict, and the trial judge did not err in overruling the motion for a new trial.

DECIDED MAY 24, 1916.

Indictment for manufacture of liquor; from Wilkes superior court—Judge Walker. December 23, 1915.

*J. M. Pitner, T. W. Rucker,* for plaintiff in error.

*R. C. Norman, solicitor-general,* contra.

WADE, J. The evidence in behalf of the State tended to show that the defendant, his father, and his brothers had been for years engaged in the illicit manufacture of intoxicating liquors. A United States deputy revenue collector testified, that he found a still in Wilkes county, Georgia, on a branch below the house of the defendant, on September 17, 1913, and that a beaten path led from the house to the still; and it appeared that hogs had been kept at the still, and had been driven away to the house of the defendant's father before the officer found the still. This officer did not see the still in operation, but saw the chimney and furnace and a good many barrels and hogsheads which had contained beer, "thrown into the branch near where the still had been," and found some "singlings" (the making of which constituted the first step in manufacturing whisky) in a barrel in a gully not far from the place where the still had been; and he saw the defendant hunting in a field not far from it. About July 4, 1915, the officer returned to the Sutton place, and arrested the defendant and carried him to Augusta, and two days later found Earl Sutton, a brother of the defendant, and a white man named Albright, working at the still, and arrested both of them. This witness did not see the defendant, Watson Sutton, at the still in July, 1915, but when going

along the road in the direction of the still he met the defendant with a little child in a buggy, going out of the community where the still was, and some hours afterwards the defendant passed him and his associate, riding horseback, and went on up the road by the house where they were, apparently without seeing them. The officer and his deputy made a detour and came into the road some distance farther from the point where the defendant passed them, but could not find the track of the defendant's horse. They came on down the road, "struck the track," and followed it nearly down to where they found the still, and found a horse hitched about 100 yards away from the still, and when they got there the copper still had been moved, but all the other fixtures were there, the hogsheads and the trough in which the meal was mixed, etc. They went back again on the 6th of July, and at that time discovered the still and captured Earl Sutton and Albright.

William Brittain testified that he had lived on the place of Jim Sutton, the father of the defendant, and knew about the still the Suttons had in that neighborhood; that he was living there when the revenue officer came there the first time, and that the father, Jim Sutton, and his boys, Watson Sutton (the defendant) and Roy, had been running the still; that the still that was located there was moved to a different place; that in 1913 the defendant was at this still and helped to run it; that in September, 1915, the witness was arrested and carried to Augusta by the revenue officer, but the still had stopped running some time before that, though the officers found where the defendant had been running it; that he helped the defendant and Roy Sutton to move "the things away from that still" before the search was made, the still being moved one night and the officer coming the next day, and they poured out the beer when they went to move it, but left the keg of "singlings" near a gully and another inside the gully; that a path led down from the defendant's house to the still found in 1915. This witness accounted for previous contradictory statements of his by admitting their falsity and explaining that he had been threatened by Jim Sutton, the father of the defendant, and had told lies in behalf of Jim Sutton and his sons, in order to protect them and because he was afraid to reveal the truth. One Lewis testified that during the year 1913 (about two years before the trial) he stayed at Jim Sutton's place, and his farm extended nearly to the

still, which was on a branch; that he saw the still there, though he did not himself work around it, and saw Jim Sutton and Watson Sutton both working there; that the still was there for the whole three years that he lived there, and that he saw Jim Sutton and Watson Sutton working there on Tuesday before the search, which was made on Wednesday, in September, 1913; that he had seen Watson and Jim Sutton working at this still off and on for three years, and that they claimed to be making whisky; that he saw Watson Sutton the day before the officer came there, working at this still. There was testimony tending to discredit the witness Lewis by showing a difference between himself and the defendant, and a threat that he would "get even" with the defendant. Also there was testimony of a physician that in 1913 the defendant had typhoid fever from the middle of June to the middle of July, and that, while he did not attend the defendant during convalescence, the defendant came to see him some time in August, and at that time was convalescing but weak, and not able to do any manual labor, in the opinion of the witness, and the witness did not believe that the defendant could have done any manual labor within two months from that day. There was testimony from one witness tending to impeach the witness Lewis on account of his general reputation, and evidence tending to sustain him.

The defendant then put his character in issue by introducing a witness who testified that he had never heard anything against the defendant until this prosecution was instituted, though since then he heard that the defendant was a liquor maker. Thereupon the State, by way of rebuttal and without objection, introduced a witness who testified that he knew the witness Lewis, and from his reputation would believe him on oath, and also that he knew the reputation of the "Sutton gang" (referring to the father of the defendant, the defendant, and several brothers of the defendant), and he said, they "have the reputation of being liquor makers and liquor sellers. Charlie is the only one of the Sutton gang. that hasn't the reputation of being a liquor maker." Another witness introduced by the State testified, without objection: "I know the reputation of the Sutton gang. I can not say specifically that I know the reputation of Watson Sutton, but the Sutton gang has. had the reputation of making and selling liquor for twenty years. They say Charlie is the only one that doesn't make liquor." And

still another witness for the State testified, without objection: "I know the reputation of the Sutton gang and they have the reputation of being liquor makers and liquor sellers. They say Charlie Sutton doesn't make liquor." It appears from the record that the defendant made no statement to the jury. See, in this connection, *Rhodes* v. *State,* 144 *Ga.* 837, 838 (88 S. E. 196).

The only ground of the motion for a new trial that we think it necessary to discuss is the third ground, which is in full as follows: "Because during the concluding argument in the case, counsel for the State, R. C. Norman, said: 'This defendant belonged to that gang over there; it was just like a den of rattlesnakes; he was raised a liquor maker; it was ground into his bones ever since he was a child, and if you acquitted him and sent him back down there, he would go right back at what he had been raised to do.' Counsel for movant requested the court to correct the solicitor-general, and to reprove him for this argument and to caution the jury not to pay any attention to the statement made by the solicitor-general complained of. To this motion, the court said: 'Counsel has got the right to draw inferences from the evidence, conclusions from the evidence.' And the jury were not cautioned and the solicitor-general was not reproved. Movant says that this was error and prejudicial error because the same affected the fair and orderly trial of the case." It is insisted by counsel for the accused that the failure of the court to comply with the request to correct the solicitor-general and reprove him for this argument, and the failure to caution the jury to pay no attention to the statements complained of, constitute reversible error, since the accused was thereby deprived of the fair trial to which he was entitled.

No labored or lengthy discussion of the point under consideration is required. Only two questions present themselves to our minds. First, was the court right in ruling in effect that the statements complained of were inferences and conclusions which might be drawn from the evidence by the solicitor; and second, was the assignment of error, complaining of the failure of the court to rebuke counsel, sufficiently full? It is too well settled to require repetition that language not authorized by the evidence or by any deduction therefrom, or argument in no way warranted by the evidence, is improper and should be rebuked on application, or in some cases, where an instruction to the jury to disregard the

improper statements is insufficient to remove the injury, would, upon motion, require the grant of a mistrial. *Ivey* v. *State,* 113 *Ga.* 1062 (39 S. E. 423, 54 L. R. A. 959) ; *Hoxie* v. *State,* 114 *Ga.* 19, 22 (39 S. E. 944) ; *Western & Atlantic Railroad Co.* v. *Cox,* 115 *Ga.* 715, 720 (42 S. E. 74) ; *Taylor* v. *State,* 17 *Ga. App.* 787 (88 S. E. 696, 697, 698). Counsel may not use his argument to the jury as a vehicle for conveying to them statements of fact not in the evidence, or opinions not based upon the evidence. Where, however, the statements or arguments of counsel may be legitimately bottomed upon facts in evidence or deducible therefrom, they will not call either for rebuke by the court or for a mistrial. "While counsel should not be permitted in argument to state facts which are not in evidence, it is permissible to draw deductions from the evidence; and the fact that the deductions may be illogical, unreasonable, or even absurd, is matter for reply by adverse counsel, and not for rebuke by the court." *Owens* v. *State,* 120 *Ga.* 209 (3), 210 (47 S. E. 545). "In a prosecution for a homicide, a statement by the prosecuting attorney in his argument, expressive of his opinion of the defendant's guilt, and his characterization of the crime as being diabolical, should be construed to mean that the testimony led him to this conclusion, and that the jury should reach the same conclusion. In the absence of anything to the contrary, the solicitor's remarks will be regarded as a deduction from the evidence. . . *What the law condemns is the injection into the argument of extrinsic and prejudicial matters which have no basis in the evidence"* (italics ours). *Floyd* v. *State,* 143 *Ga.* 286, 289 (84 S. E. 971). In *Ivey* v. *State,* supra, the judgment was reversed because the solicitor-general in his address to the jury used "highly improper language not authorized by the evidence or *any fair deduction therefrom"* (italics ours). In that case the solicitor-general used the following language: "Gentlemen of the jury, I want you to stand by me and help me break up this vile den," and "Gentlemen of the jury, if you could go over this town and see the good mothers whose pillows have been wet with tears over their boys who have been intoxicated *by the acts of this woman,"* etc. (italics ours). In the opinion it was said: "The motion for new trial shows that the solicitor-general stated as facts things to which no witness had testified,—that good mothers had wet their pillows with tears over

their boys who had been intoxicated by the acts of the accused. These remarks were not warranted by the evidence, and were plainly calculated to prejudice the accused." It is apparent that the solicitor-general in that case asserted as' a fact that the acts of the defendant had intoxicated the boys of a certain town and thereby brought tears-to the eyes of their mothers. The defendant was charged with selling intoxicating liquors without a license, and this statement of the solicitor-general amounted in effect to an independent statement from him that the accused was guilty of the crime charged.

In the case now under consideration the defendant placed his character in issue, and a witness introduced in his behalf testified to his good character, and further stated that he had never heard anything against him until the prosecution for manufacturing liquor was instituted, but had heard since that the defendant was a liquor maker. The State thereupon made proof that the entire family of the defendant, with the exception of one member, had for twenty years borne the reputation of making and selling liquor. The defendant was not required to put his character in issue, but voluntarily did so, and thereby laid himself open to attack on this line. Whether the particular testimony offered by the State to rebut the evidence of good character presented by evidence introduced by him was altogether relevant or otherwise free from objection need not be considered, since no objection was interposed. In addition to the testimony showing that the "Sutton gang," which included the defendant, had long enjoyed a well-earned reputation as liquor makers and liquor sellers, the testimony of the revenue collector, of the witness Brittain, and of the witness Lewis tended to show that the defendant, his father, and his brothers had been for years persistent violators of the law, and the statement of the solicitor-general that the defendant belonged to a gang of liquor makers and had been "raised a liquor maker," and had had the inclination to manufacture intoxicants "ground into his bones ever since he was a child," was apparently deducible from the facts in evidence, and fully warranted by the testimony as a whole. The further argument of the solicitor-general, that if the jury acquitted the defendant and permitted him to go home he would renew his former activities, and would again engage in doing "what he had been raised to do," was merely a prophecy or pre-

diction, and did not inject into the case any statement as to any existing extrinsic fact. Under the proof, the conclusion of the solicitor-general appears to be fairly deducible from the evidence. If the defendant had been one of a gang engaged since early youth, for a period of about twenty years, in distilling intoxicating liquors (and there was evidence to this effect before the jury unobjected to), it appears to us that the solicitor-general might logically infer, from the proved facts, that the defendant would resume his former occupation; and certainly the opinion entertained and expressed by him was not an opinion based wholly on extrinsic matters not in evidence, but was an opinion deduced from the evidence itself. Not only does it appear from the record that the opinion of the solicitor-general was fairly deducible from the evidence, but it appears to us to have been a sane and sensible conclusion, in view of the evidence as to the long continued folly of the defendant in violating the law; and upon the authority of Solomon, who most of us have been taught to believe was the wisest man that ever lived, we know that "as a dog returneth to his vomit, so a fool returneth to his folly." Proverbs, xxvi. 11. However, under the ruling in the *Owens* case, supra, if the statement of the solicitor-general was based upon evidence, it is immaterial whether it was illogical.

The remaining point for consideration is whether the assignment of error as made presents any real question for determination. By reference to this entire ground of the motion, quoted above, it will be noted that the movant "complained" of the statement made by the solicitor-general, and requested the court to correct and reprove him for the argument objected to, and to caution the jury not to pay any attention to the statement objected to; and this ground of the motion recites that they were not cautioned and the solicitor-general was not reproved, and that "this was error and prejudicial error, because the same affected the fair and orderly trial of the case." How the statement and argument objected to "affected the fair and orderly trial of the case" does not appear from the ground of the motion itself; for it is not alleged in this ground that the argument or statement made by the solicitor-general was not in fact authorized by the evidence in the record. If, as suggested above, and as recognized time and again by the Supreme Court and this court, the statement or argument of the solicitor-general was

authorized by the evidence, then undoubtedly the court was correct in not rebuking him on motion of counsel for the defendant, and in not cautioning the jury to disregard such statement or argument. The plaintiff in error must always show error, and must show *in what* the alleged error consists, and simply to say that the statement of the solicitor-general was prejudicial error because it affected the fair and orderly trial of the case, leaves us to conjecture how or for what reason (so far as the ground of the motion itself is concerned) the alleged error was in fact error, or in fact prejudicial to the defendant.

The decisions of the Supreme Court are binding authority upon this court, and the precise question was recently adjudicated in *David* v. *Tucker,* 140 *Ga.* 240 (10), 245 (78 S. E. 909), where that court said: "Where, during the argument of the case by the plaintiff's attorney, the defendant's counsel interposed the objection that the argument then being advanced was improper, and asked the court to disallow the same, and the court ruled upon the question in the following language: 'If there is any legitimate evidence on which to base that as a legitimate conclusion, I will let that go in; whatever is in and not ruled out can be argued,' a general exception assigning this ruling as error is without merit, in the absence of an allegation or showing, in the ground of the motion itself, that the argument was not authorized by any evidence in the record." The ground of the motion in this case does not itself show that the argument was unauthorized by any evidence in the record. Even if the defendant had not put his character in evidence the argument, if deducible from the evidence offered by the State and admitted without objection, would have been permissible under the ruling in the case of *Rhodes* v. *State,* supra.

In view of the undisputed testimony that the defendant was seen working at and around a still engaged in the unlawful manufacture of liquor about September 13, 1913, and thereafter, it appears that, but for the effort to impeach two of the witnesses for the State upon whose evidence the conviction depended, a verdict of guilty would have been demanded (if this is ever true in a criminal case), since the accused made no statement to the jury; and, except for his plea of not guilty, and the presumption of innocence, there is absolutely nothing to negative the testimony of

several witnesses, who were credited by the jury, that he had been actually and actively engaged in the illicit business during a considerable period of time and within the period of two years from the time the indictment was found.          *Judgment affirmed.*

RUSSELL, C. J., dissenting. I think that the court erred in not applying a drastic remedy, upon the appeal of counsel, as to what I think was highly improper and prejudicial argument by counsel for the State.